### SIMPKINS *vs.* LOW. .

In an action to recover damages for refusing to deliver bonds, alleged to have been bought by the defendant as the plaintiff's agent, the plaintiff, to prove the value of the bonds, may show that they were paid by the company issuing them, in gold. He may also prove what gold was worth, in currency, at that time. (J. C. SMITH, J. dissented.)

It is erroneous to limit the plaintiffs's recovery, in such an action, to nominal damages, where there is proof that the bonds were worth par, in gold, as collateral security, and the evidence warrants the conclusion that they were worth more than par, in currency.

Such evidence should be submitted to the jury, and it should be left with them to assess the damages, free from any restriction. The legal tender act, passed by congress, is not to be construed as excluding such evidence from the consideration of the jury.

It was not intended, by that act, to enable an agent, after having received for a claim gold coin, to relieve himself from liability by payment in currency. (*Per* INGRAHAM, J.)

Where there are no actual sales of an article, a witness may give his opinion of the value of such article. (*Per* INGRAHAM, J.)

THE complaint in this action alleges that the plaintiff employed the defendant to buy forty bonds of $500 each, in all $20,000, of the San Francisco Water Works Company. That the defendant, while employed as the plaintiff's agent, bought the bonds for $23,000. That the plaintiff claimed

Simpkins *v.* Low.

and demanded the bonds of the defendant, but he refused to deliver them, and converted the bonds to his own use. That the value of the bonds is $50,000. That the plaintiff is damaged to the extent of $27,000, and judgment was demanded for that amount. The answer denies the agency, and the purchase for the plaintiff, and the conversion ; and claims the bonds as the defendant's.

On the trial, before a justice of this court and a jury, the plaintiff proved an employment of the defendant, in February, 1864, to buy these bonds of a man named Emery, in Maine. It appeared that the defendant bought the bonds during that February of Emery ; that Emery knew nothing of any employment or agency of the defendant, and sold the bonds to him. The defendant paid for the bonds with his own money, and afterwards refused to let the plaintiff have them. The defendant moved for a nonsuit, on the ground that the action would not lie, because the plaintiff showed no title to the bonds. The motion was denied, and the defendant excepted. The case then went to the jury on the question of damages. On this part of the case, the evidence was that the bonds were ordinary obligations of this corporation for the payment of so much money, with interest, and that they were due in April, 1864. Also, that there was no market price for such bonds in 1864, either at San Francisco or at New York, and that the highest price paid for them, in any single transaction, was 106, which was below the price paid to Emery. The plaintiff then offered to prove, by a person who held other bonds of this company, maturing at the same time and of the same date, that they were paid in gold. The evidence was excluded. He then offered to show, by a person who was an officer of the company, that the company ordered its treasurer to pay the bonds maturing at this time in gold, and that all the bonds of this issue were paid in gold on presentation. This evidence was also excluded. This witness made a statement that the bonds were worth the value of gold—at that time being $2.40 in legal tender notes for $1 gold, but this value was in

their use as collataral security. He knew of no sales. The defendant moved to strike out this evidence; the judge, however, refused to do so, and the defendant excepted.

The defendant's counsel having summed up the case, the judge stated that he was satisfied the plaintiff could only recover nominal damages, as the bonds had no market price, and no intrinsic value, legally, beyond the amount due by them, measured in the lawful currency of the country, i. e. $20,000; and he instructed the jury to render a verdict for the plaintiff for nominal damages only, to which the plaintiff excepted.

The jury rendered a verdict for six cents, and the defendant had judgment for costs; from which the plaintiff appealed.

*James C. Carter*, for the appellant. I. The relation of principal and agent, which subsisted between the plaintiff and the defendant, was a purely legal relation, and whatever property the defendant purchased as the plaintiff's agent became *eo instanti* the property of the plaintiff, unless the defendant had taken the title to himself in such a manner as to require the execution of some formal instrument of assignment or transfer to the plaintiff. In the latter case the plaintiff would have the equitable title. (*Robinson* v. *The United Ins. Co.*, 1 *John.* 592.)

II. The purchase by an agent of a chattel or chose in action transferable by delivery, vests the legal title in the principal, and an appropriation of the thing thus purchased by the agent to his own use is a conversion, for which trover would lie. The circumstance that the agent paid for the article purchased with his own money, at the request of the principal, would not affect the question of title. It would give him a lien for the price, which is not inconsistent with the legal title being in the principal.

III. But the question where the legal title to the bonds was is wholly immaterial. It was the duty beyond question

of the defendant to have given the plaintiff the benefit of the purchase, and for this breach of duty an action lies.

IV. The frame of the complaint embraces either view of the case, and in either view the measure of damages is the same, viz. what the plaintiff has lost. He has lost the value of the bonds, less the price the defendant paid for them.

V. Treating the action as in the nature of trover, the plaintiff was entitled to a verdict for the full value of the bonds, without any deduction for the price he had paid for them. (*Vincent* v. *Conklin*, 1 *E. D. Smith*, 203.) One who has converted property to his own use, is not entitled to set up a lien in mitigation of damages. He must resort to his separate action to recover his debt. The plaintiff was, therefore, entitled to a verdict for the full amount of the bonds, without reference to the gold question.

VI. The plaintiff was also entitled to a verdict for the highest value the bonds had borne at any time prior to the trial. This is the invariable rule in cases of trover, and also in cases of tort, where, though the action is not trover in form, the damages are to be arrived at by ascertaining the value of property of which the plaintiff has been deprived. (*Blot* v. *Boiceau*, 3 *Comst.* 78. *Parsons on Cont.* 5 ed. vol. 3, p. 190, et seq. *Romaine* v. *Van Allen*, 26 *N. Y. Rep.* 309.) *West* v. *Wentworth*, 3 *Cowen*, 82. *Ch. J. Kent, in Hart* v. *Ten Eyck*, 2 *John. Ch.* 116. *Arnold* v. *Suffolk Bank*, *per Emott J. Wilson* v. *Matthews*, 24 *Barb.* 295. *Wilson* v. *Little*, 2 *N. Y. Rep.* 443.) 1. This results necessarily from the maxim that a wrongdoer is not to be permitted, in any event, to make a profit out of his misdeeds. 2. The rule is specially applicable to the present case, where it was the manifest object of the defendant to secure to himself the profit of the purchase.

VII. The damages sustained by the plaintiff were to be computed in the treasury note currency. 1. It was in this currency that he would be compelled to receive satisfaction.

2. By a law of political economy the most depreciated currency supplants all others, and such is the fact with us.

VIII. The law holds itself competent in all cases where one man has sustained a pecuniary injury, by the act or omission of another, to ascertain and determine its amount. Least of all does it scandalize itself by the disgraceful confession that a gross fraud can be permitted to pass unpunished from any inability on its part to estimate the extent of the injury.

IX. The ground upon which the learned judge excluded the evidence offered as to the value of gold, and upon which his direction to find a verdict for nominal damages only was based, was that by virtue of the act of congress hereinbefore referred to, it was not allowable to found a claim for damages upon the difference in value between gold and paper currency. This was error. 1. The act of congress enacted only that the treasury notes should be a legal tender for the payment of debts. It did not affect to deal with the question of the actual value of the paper currency. Any such interference, would, by well understood principles of political economy, have been quite ineffectual. 2. To determine what shall constitute a legal tender for the payment of debts, is within the power of legislation; but to determine what shall be the exchangeable value of things, is wholly beyond the power, and therefore outside of the province, of governments. 3. Not only did congress not affect to make the values of gold and paper currency equal, but it has in divers ways recognized the fact, that they are not, and cannot be made equal. (*a.*) In requiring the payment of duties in gold. (*b.*) In agreeing to pay interest on its bonds in gold. (*c.*) In laws providing for the deposit of gold in the treasury, by way of loans to the government, which are to be paid in gold. 4. It is manifest that these laws cannot be obeyed and executed unless the courts everywhere recognize the difference between gold and paper currency. 5. It is believed this difference is now in

fact constantly recognized in all the courts, except in those cases *ex contractu*, in which the question arises as to what will discharge a debt.

X. When the value of any thing is sought to be proved, with the view of recovering such value in the way of damages, the regular mode of procedure is to prove it by the market value, at the place nearest the forum of the controversy. If the thing is of such a character that it cannot be said to have a market any where, then the nature and characteristics of the thing are to be proved, and upon such evidence the jury are to base their decision. (*Harris* v. *The Panama R. R. Co.*, 5 *Bosw.* 312. *Marshall* v. *The N. Y. Central R. R. Co.*, 45 *Barb.* 502.) In ·the case of a thing having no market value, every thing connected with it tending to show the pecuniary advantage which accompanies its ownership is receivable in evidence.

XI. The case of a chose in action, such as a bond, forms no exception to the general rule, and the value of the bonds in question was proved in exact accordance with the rules above stated. 1. The only place where there could be said to be any market for the bonds was in San Francisco—and a witness, Charles H. Simpkins, who could tell their value, if any one could, testified that they had been worth, since the time of the transaction, as high as 260. 2. It turned out, indeed, that the witness could not state any sales since 1863. But this does not destroy his evidence as to value. A man familiar with things and with such dealings as are held in them, is competent to speak of their value, even at a time during which he can state no transactions. Inquiries about the value of commodities, offers made and reported, are a sufficient foundation to make the judgment of a witness receivable. 3. It is every day's practice for brokers and merchants to testify as to the prices of commodities at times when they know of no transactions. The ignorance of transactions is a circumstance to go to the jury to influence the weight to be given to the testimony. 4. The main point is,

whether the witness occupied a position from which he could form a fair judgment as to the value. 5. It further turned out that this witness had never known a sale of the bonds for paper currency ; and for the good reason that transactions in that currency were never known in California. But the only effect of this was to make it important to know whether he had rightly estimated the value of gold. It certainly could not render his evidence wholly incompetent. 6. If this were so, then had the securities been English *consols* as to which we should have had to prove the market value in London, the difficulty would have been just as fatal. 7. But why the value of gold should not, after the above evidence had been given, have been permitted to be proved, it is hard to understand, except upon the view entertained by the learned judge that it was *illegal* to raise the question of a difference between the value of gold and paper currency. This point has been already discussed. The learned judge would not certainly have held that in the case of English *consols*, after proving the market value in London, the value of sterling currency could not have been proved.

XII. The learned judge was evidently under the impression that inasmuch as *by law* no more than the par value of the bonds in currency could be collected from the obligee, the payment of them *in gold* would be a *gratuity ;* and that the fact of such a gratuity could not be made the basis of a claim for damages. In fact, he seemed to suppose that it was *in legal contemplation, impossible,* that a chose in action upon which nothing more than *par* could be collected should have a greater than *par value.* But this is a clear error.

XIII. What has been said is sufficient to show that error was committed in excluding the evidence offered. But, in fact, much of the evidence excluded, was, in one way or another, received in the course of the trial, and the learned judge denied a motion to strike it out. In this way there was enough evidence in the case to warrant the jury in finding a large verdict for the plaintiff, and the final direction of the

judge was error.   1. It was proved that *in fact*, by custom universally recognized, gold was the only currency in use in California, and that all obligations were paid in it.   2. It was proved that this very issue of bonds was paid in gold. 3. It was proved that they always bore the par value, or but very little less, in gold.   4. It is a fact which the court and jury judicially know, that gold was at an enormous premium during the very time to which the proper rule of damages relates, and the value of gold itself is really sufficiently proved by the witnesses who testified that the bonds were worth from 240 to 260 in currency, as it is clear that their judgment was formed by converting the value of gold into paper currency. 5. Could not the jury say upon all that proof that the plaintiff had sustained damage, and measure against a wrong-doer the amount of it, especially when the legal rule by which their estimate was to be governed was, that they should see to it that the plaintiff should have the benefit of the highest value before the trial, so that the defendant should not make a profit by his fraud ?   6. Finally, on a principle of law already adverted to, the plaintiff was entitled to a verdict for the *par* value of the bonds, even supposing all the views of the learned judge as to the gold question to be well founded.

*James Emott*, for the respondent.   I.   This is an action for the conversion of the property which is the subject of the suit, to wit, the forty bonds.   The complaint alleges their purchase by the defendant for the plaintiff, and that the latter owned, and had a right, to them, and it asks damages for their conversion.   Such an action will not lie.   The plaintiff never paid any thing for the bonds, and never had the possession of them.   He never even tendered the money for them, and had no title to them.

II.   Assuming all that is claimed by the plaintiff, yet he did not become the legal owner of the bonds, and had no right and no remedy, except in equity, to enforce a trust upon the bonds in the defendant's possession, and against the legal

title of the latter. Where an agent or trustee to buy for another, buys for himself under circumstances which deprive him of the right of so doing, his title to the property purchased is not void, but voidable only at the suit of the principal or *cestuis que trust.* The latter does not obtain title by such a purchase. All that he can do is to proceed in equity to set aside the purchase of the trustee, and have the property conveyed to himself. (*Sweet* v. *Jacocks,* 6 *Paige,* 355. *Johnson* v. *Bennett,* 39 *Barb.* 237, 249. *Olcott* v. *Tioga R. R.,* 27 *N. Y. Rep.* 546, 567. *Smith* v. *Lansing,* 22 *id.* 520.) And in such a case as this, of naked parol agency, this relief cannot be had if the agency is denied. (*Bartlett* v. *Pickersgill, Eden R.* 515.)

III. The action being brought for a conversion, the plaintiff cannot be allowed to recover for a nonfeasance or neglect of duty. That would be to change the whole cause of action. (*Moore* v. *McKibbin,* 33 *Barb.* 246.)

IV. The plaintiff should, therefore, have been nonsuited in this action, because he showed no title to the property.

V. If, however, on this state of the pleadings and proofs, the court will go on to consider what action might be maintained, the only ground for a suit will, of course, be that of neglect of duty by the defendant, as an agent ordered to buy certain property for his principal, in not so buying it.

VI. In this, which is the only possible aspect of legal liability, it makes no difference that the defendant bought the property for himself. That fact belongs to the frame work of a totally different suit. Here the case is precisely the same as if he had not bought the bonds at all. The injury to the plaintiff is not that the defendant bought this property for himself, but that he did not buy it for the plaintiff. The action is for negligence — non-feasance.

VII. We say, then, that no action will lie by a person who employs another to do an act without paying him, and without placing any money or property in his hands, against that person, for a mere neglect to do the act. There is no con-

sideration, and no legal damage. (5 *T. R.* 143. *Coggs* v. *Bernard,* 2 *L. Raym.* 909.)

VIII. There is no legal proof of damage in this case, because there is no proof that the plaintiff actually lost any such bonds as he desired to purchase. These were not the only such bonds in existence. They were a commodity of which there was more, part of a class of which they were but a small number. The defendant did not have the plaintiff's money and invest it against orders, or withhold it so as to prevent the plaintiff investing it. *Non constat,* that the plaintiff could not, and did not, buy other bonds. Again, the plaintiff never made any contract to purchase these bonds, and there is no legal proof of what they would have cost him. There is no agreed price, and no market price, in Maine, with which to compare a New York price. The damages are too remote. (*Short* v. *Skipwith,* 1 *Brock. C. C. Rep.* 193. *Bell* v. *Cunningham,* 3 *Pet.* 69. *Greening* v. *Wilkinson,* 1 *C. & P.* 625.)

IX. At the utmost, only the market value could be considered. If the defendant had had the funds, and withheld them, or invested them contrary to orders, the enhanced market value of the article which he was ordered to buy is the only measure of damage, and not intrinsic value, or any peculiar value of the article to the plaintiff. (*Smith* v. *Coudry,* 1 *How.* 28.) The property in this case possessed no market value whatever.

X. In any view of the case, the plaintiff's damages can be only nominal. We have already seen that the property which the defendant failed to buy had no market value, so that no recovery could be predicated upon the difference between the selling price and the market price. But the controlling feature of the case on this point is, that these bonds were simply evidences of debt—obligations for the payment of money. Such obligations may be worth more than their face, or the amount due upon them, if they have become articles of merchandise in the stock market, and have

a market price. Such is the fact with various railroad bonds, state, town and county bonds, &c. These are bought and sold, and they may be worth more or less than their face, or *par.* But where such obligations have no such market price, they are simply worth the amount due upon them — that is, their only legal value.

XI. As obligations and evidences of debt, they were payable and capable of discharge in the lawful currency of the country, whatever that is. The bonds were worth, intrinsically, what the obligors could be compelled by law to pay or perform upon them; and this was simply $20,000 and six months' interest.

XII. It would make no difference if the legal tender law were unconstitutional, because that would change the currency or vehicle of payment of the price of the bonds, and of the amount due or required for tender by the plaintiff, as well as of the amount due on them. In other words, if gold were the only legal measure of values, then it must measure all the values in the case; and the buying price and selling price, and the amount of damages must all be stated in gold. If "greenbacks" are not money, 240 in greenbacks is not a money price or measure of value at all.

XIII. In effect, all this follows from the fact that the instruments in question were evidences of debt, contracts for the payment of money, and not contracts for the delivery of bullion or merchandise. There can be no value predicated of such contracts but the amount due upon them, which the court can only estimate in so many dollars, leaving the law to say in what currency it is to be paid; unless, as already stated, the instruments or obligations are regularly bought and sold, and have a market price. It would be extraordinary to hold that, while if the plaintiff had held the bonds, and he could have enforced them for only $20,000, yet against a person who had broken a contract or duty to get them, they could be valued at $36,000.

XIV. Evidence to show that the debtors had paid these

Simpkins *v.* Low.

bonds in gold coin, and not in legal tender notes, and evidence of a price of gold in market,.that is, of a difference in the value of these two kinds of currency, was properly rejected ; and the jury were correctly instructed, that there was no evidence in the case upon which more than nominal damages could be recovered. The notes of the government are a lawfal tender for the payment of debts. (*Legal Tender cases*, 27 *N. Y. Rep.* 400.) Gold and silver coin is nothing more, and cannot be regarded by the courts as possessed of any different or greater value legally as a medium in which a debt may or has been paid. If the defendant had agreed to buy the bonds and collect the money on them, in gold, for the plaintiff, and had so collected the money, *in gold,* and had not paid it over ; the tender of an equal number of dollars in legal tenders, would have been an offer of full performance.

XV. If the courts could attach any different value in law to $20,700 paid in gold coin from $20,700 paid in legal tender notes, still it would not help this case, because the payment in coin was a mere gratuity. The company which issued these bonds agreed for nothing but a payment in legal tender notes ; they could be compelled to nothing more. This sale was before maturity. All that could possibly be predicated on the subject was a chance or expectation that this company would pay in gold. This expectation is not a legal cause of value or a subject of sale. (*Munsell* v. *Lewis, 4 Hill,* 635, *and cases cited.*)

XVI. Of course, the fact that the bonds were actually paid in gold coin afterwards, cannot affect the legal aspect of this case, or the rights of the parties. That was a purely voluntary act ; and if it was any thing more than simply payment of the debt in the eye of the law, it certainly cannot make obligations, which did not require it, worth more at a time previous to their payment.

It must not be forgotten that this action, if it lies at all, does not rest on. any property of the plaintiff in the bonds, for he never had any, but on an injury to him by neglecting

to buy them, which is to be measured by the difference between their agreed price, if there had been any, and their value at that time, which is again the amount payable and collectable by them.

INGRAHAM, J.  This action was brought to recover damages for refusing to deliver certain bonds.  The question arising in the case is as to the proof of damage, and the ruling of the judge that the plaintiff could only recover nominal damages.

The plaintiff, to prove the value of the bonds, offered to show that they were paid in gold by the company issuing them.  This was excluded by the court.  He also offered to prove what gold was worth in currency, at that time.

I think this evidence was admissible.  The plaintiff could recover the value of the converted property at any time between the conversion and the trial ; and the fact that they had been paid in gold was admissible to show what sum the plaintiff had lost by the wrongful act of the defendant.

I think, also, the judge erred in limiting the recovery to nominal damages.  There was proof of their value if paid in gold.  It is true that was the opinion of the witness, merely, and not an actual sale.  But where there are no actual sales of an article, a witness may give his opinion of the value of such article.  Simpkins testified that the bonds were worth par, in gold, as collateral security ; that he had borrowed on them at that rate ; their value in currency was 260.  He also states previous sales in gold at 90 to 95.  He adds that their value was 240 to 260 in currency, not that he knew of sales to that amount.  This evidence was in the case, and the judge refused to strike it out.  It was before the jury, and certainly warranted the conclusion that the bonds were worth more than par in currency.  I do not consider the legal tender act passed by congress, as excluding this evidence from the consideration of the jury.  The charge of the court seems to have been founded on that statute.  I

Simpkins *v.* Low.

think the evidence should have been submitted to the jury, and that it should have been left with them to assess the damages, free from the limitation which the court put upon them.

The true question was not what the obligors could be compelled to pay for them, but what they actually did pay, in ascertaining the plaintiff's loss. Suppose the defendant had retained the possession of the bonds until their payment, would it not have been admissible to prove that fact, and that the defendant received on such payment, gold to the face of the bonds ? I cannot think that it was intended by the legal tender act, to enable an agent to receive for a claim, gold coin, and relieve himself from liability by payment in currency. Not that a contract may be violated, and the party in default relieve himself from damages by paying in currency for what he has realized in gold.

The question will be presented more forcibly by suggesting the case of one who has a sum of money in gold coin to deliver to another, which he refuses to deliver, and converts to his own use. Would justice be satisfied by holding the defendant excused on paying that amount in currency ? The same principle must govern here.

A new trial should be ordered, costs to abide the event.

LEONARD, P. J. concurred.

JAMES C. SMITH, J. (dissenting.) I am of opinion that this case was correctly disposed of at the circuit.

Whether the true theory of the action is that the defendant is liable by reason of his neglect to purchase the bonds for the plaintiff, or that the plaintiff became the owner of the bonds through the defendant's purchase, and the defendant is liable for their conversion, in either case the measure of the plaintiff's loss is the excess of the value of the bonds over and beyond the sum which the defendant paid for them. There is no legal evidence that the value of the bonds ever

exceeded the sum paid for them by the defendant, and consequently the plaintiff is not entitled to recover more than nominal damages, in any aspect of the case.

*Prima facie,* each of the bonds, forty in number, was worth only the sum payable by its terms, to wit: 500 dollars, or 20,000 dollars in the aggregate, being 3000 dollars less than the amount paid by the defendant. This was not conclusive, however, and it was competent for the plaintiff to show, if he could, that the bonds were worth more than par. He undertook to prove that they were worth much more than the defendant paid for them, but the testimony produced by him was insufficient for that purpose. The proof showed that the bonds were issued by a corporation in the state of California, known as the San Francisco Water Works Company. They were issued in 1859, and were made payable in April, 1864. The whole amount of bonds created was 150,000 dollars, but the amount actually issued by the company was only 84,500 dollars. The bonds were never sold in public market, and there was no market price for them in San Francisco, New York or elsewhere. The only private sales shown, were the one in controversy, and four others which took place in 1860 or 1861, at San Francisco, at prices ranging from ten per cent below par, in gold, to six per cent above. In the absence of evidence that the bonds had a market value exceeding the price paid by the defendant, the plaintiff proved, or offered to prove, that customarily all transactions in California are in gold currency, unless otherwise expressly agreed ; that the receipts of the company for water dues were collected in gold ; and that the company, in pursuance of a resolution of their board of directors, paid in the like currency other bonds of the same issue as those in suit, upon presentation. The plaintiff also offered to prove the market price of gold in July, 1864, and it may be assumed, for the present purpose, that between the time of the defendant's purchase in February, 1864, and the commencement of this suit, gold was sold in market at a pre-

Simpkins *v.* Low.

mium of 140 per cent—that is, at 240 per cent in paper currency. But all this testimony fell short of establishing that the bonds had any other than their *prima facie* value. They were not, by their terms, payable in gold ; and if they had been so payable, the company, nevertheless, would have had a right to satisfy them by paying, or offering to pay them, in legal tender notes. (*Rodes* v. *Bronson,* 34 *N. Y. Rep.* 649.) Payment by the company, of more than the face of the bonds, would have been a mere gratuity. If it had been shown, however, that the probability, or even expectation, that the company would pay the bonds in gold, gratuitously, had raised their price in market above their par value, the case would have been materially different ; but there is no evidence that such was the fact.

The testimony of the plaintiff, and of his brother, that the bonds were worth in currency whatever gold was worth, to wit, from 240 to 260 per cent, adds nothing to the plaintiff's case. It is apparent from the cross-examination of these witnesses that they had no facts to go upon, except those above stated, and that their testimony on the subject of the value of the bonds is simply the expression of an opinion, or rather of a truism, that if the bonds were in fact paid in gold, they were worth, to the holder, what gold was valued at in the market.

The judgment should be affirmed.

New trial granted.

[NEW YORK GENERAL TERM, April 3, 1867. *Leonard, Ingraham* and *J. C. Smith,* Justices.]